**Suketu H. NANAVATI, M.D., Plaintiff,**

**v.**

**BURDETTE TOMLIN MEMORIAL HOSPITAL; Executive Committee of the Medical Staff of Burdette Tomlin Memorial Hospital and Robert J. Sorenson, M.D., Defendants.**

**Robert J. SORENSON, M.D., Plaintiff,**

**v.**

**Suketu H. NANAVATI, M.D., Defendant.**

**Civ. A. Nos. 83–0794, 84–1790.**

United States District Court, D. New Jersey.

Oct. 2, 1986.

Schwartz & Fioretti by Stacey L. Schwartz, Cherry Hill, N.J. and Kohn, Savett, Klein & Graf, P.C. by David H. Weinstein, William B. Lytton, Philadelphia, Pa., for Suketu H. Nanavati, M.D.

Horn, Kaplan, Goldberg, Gorny & Daniels by Robert E. Paarz, William M. Honan, Atlantic City, N.J., for Burdette Tomlin Memorial Hosp., The Executive Committee of the Medical Staff, and Robert J. Sorenson, M.D.

Valore, McAllister, Westmoreland, Gould, Vesper & Schwartz by Carl J. Valore, Nina Chase, Northfield, N.J., for Burdette Tomlin Memorial Hosp.

Brad J. Spiller, Camden, N.J. and F. Emmett Fitzpatrick, P.C. by F. Emmett Fitzpatrick, Jr., F. Emmett Fitzpatrick, III, Philadelphia, Pa., for Robert H. Sorenson, M.D.

Rubins, Waldron & Barry by James A. Waldron, Wildwood, N.J., for Executive Committee of the Medical Staff of Burdette Tomlin Memorial Hosp.

COHEN, Senior District Judge:

This complex, multi-issue case, which included claims and counterclaims among Dr. Suketu H. Nanavati, Dr. Robert J. Sorenson, the Burdette Tomlin Memorial Hospital ("BTMH" or "the Hospital")[1] and the Executive Committee of the Hospital's Medical Staff ("the Executive Committee")[2] was tried before a jury for nine weeks. Sixty-five witnesses were presented, nine lawyers and their staffs participated in the case, and eleven separate opinions, 4 before trial and 7 during trial, were filed by this Court. Forty-five special interrogatories were submitted to the jury. The jurors deliberated for 4 days, and, during this time, communicated with the Court on 8 occasions.

Presently before the Court are post-trial motions by plaintiff/counterclaim—defendant, Dr. Nanavati, defendant/counterclaim—plaintiff, Burdette Tomlin Memorial Hospital, and defendant, the Executive Committee. Dr. Nanavati moves for a judgment notwithstanding the verdict ("j.n. o.v.") pursuant to Fed.R.Civ.P. 50(b), and, in the alternative, for a new trial pursuant to Fed.R.Civ.P. 59(a). BTMH and the Executive Committee also move herein for j.n.o.v. and, alternatively, for a new trial.[3]

I. BACKGROUND

The factual predicate for this case is somewhat difficult to summarize, as it consists of events taking place over a number of years. Without purporting to illuminate every nuance of the matter, we shall set forth a brief account of the facts.

Dr. Nanavati, who speaks English with an Indian accent, is a dark-skinned native of Ahmedabad, India. He was educated in India and, in 1970, came to this country to continue his medical education. He was eventually naturalized as a United States citizen, and was Board Certified in Cardiology in 1977. Thereafter, he served as Chief of Cardiology in a hospital at Debois,

---

1. Burdette Tomlin is a small non-teaching community hospital. It had 171 beds in 1979, and 239 beds as of January 1984. It is located in Cape May Courthouse, New Jersey, and is the only hospital in Cape May County.

2. Two separate cases, Civil Action Nos. 83–0794 and 84–1790 were consolidated for trial by this court. Dr. Nanavati is the plaintiff in Civil Action No. 83–0794 and the defendant-counterclaimant-plaintiff in Civil Action No. 84–1790. Dr. Sorenson is the plaintiff in Civil Action No. 84–1790 and the defendant-counterclaimant-

plaintiff in Civil Action No. 83–0794. The Hospital and the Executive Committee are the defendants-counterclaimants-plaintiffs in Civil Action No. 83–0794.

3. BTMH and the Executive Committee, by motion filed July 25, 1986, request this Court to "mold" the antitrust verdict. Since, however, judgment was entered on the jury's verdict on July 23, 1986, two days prior to the filing of this motion, said motion shall be denied as moot.

Pennsylvania, for about a year and a half, at which time he sought to move his practice to New Jersey. In March of 1979 Dr. Nanavati began working at BTMH, having gained admission to the medical staff without difficulty. Prior to his admission and shortly after his arrival at BTMH, Dr. Nanavati discussed the opportunities for reading Electrocardiograms (EKG's)—a privilege which earns the reading physician $5.00 for each EKG—with the Chief of Cardiology at BTMH, Dr. Robert Sorenson. Dr. Sorenson, who is Board Certified in Internal Medicine, but not in the subspecialty of Cardiology, had exclusive control over allocating these reading privileges.

Approximately three weeks after his arrival at BTMH, Dr. Nanavati, having encountered resistance to his attempts to share immediately in the reading of EKGs sought assistance in attaining the privilege from the Executive Committee of the Medical Staff. A few days later, evidently angered upon being told that he must await Dr. Sorenson's decision regarding the date he could expect to begin reading EKGs, Dr. Nanavati verbally inquired, at a meeting of the entire medical staff, why an "inferiorly qualified" physician controlled the EKG readings. Trial transcript of June 2, 1986 at pp. 81–84.[4] Thus was fired the opening shot of an economic battle—a competitive fight—between these two doctors for the control of medical care of cardiac patients in Cape May County.

Subsequent to this incident, with the apparent achievement of a complete alienation of Dr. Sorenson, Dr. Nanavati proceeded to challenge a variety of matters concerning hospital practices and patient care within Cape May County. These challenges included public accusations that Dr. Sorenson was incorrectly interpreting EKGs, quarrels with nursing personnel, and confrontations with members of BTMH's Medical Staff. Eventually, purportedly because the Hospital determined that he was disruptive, overly aggressive, and incapable of working harmoniously with others, attempts were made to revoke Dr. Nanavati's staff privileges. A brief litany of some of the key occurrences follows.

In June of 1982, Dr. Nanavati filed a charge against BTMH with the Equal Employment Opportunity Commission ("EEOC") alleging national origin discrimination. In August of 1982, charges were filed with the Executive Committee seeking Dr. Nanavati's termination from the medical staff. On September 9, 1982, Dr. Nanavati filed a second charge against BTMH with the EEOC alleging unlawful retaliation. On November 12, 1982, Dr. Nanavati's staff privileges at BTMH were deemed terminated. Five days later, on November 17, 1982, pursuant to a complaint filed in the Chancery Division of the Superior Court of New Jersey, a temporary restraining order was issued which reinstated Dr. Nanavati to the BTMH staff. On March 8, 1983, Dr. Nanavati filed his complaint in the instant case. On March 17, 1985, pursuant to its holding, on January 14, 1985, that the Hospital and the Executive Committee violated the medical staff bylaws by the manner in which they handled the disposition of the charges against Dr. Nanavati, the Chancery Division of the New Jersey Superior Court entered a judgment permanently enjoining BTMH and the Executive Committee from attempting to terminate Dr. Nanavati's staff privileges based upon the earlier charges.[5]

The legal claims advanced by the parties in the present case included a claim by Dr. Nanavati against the Hospital and the Executive Committee for an alleged violation of the 1870 Civil Rights Act, 42 U.S.C.

---

4. To be noted is that Dr. Nanavati was, some time thereafter, at the urging of the Executive Committee, granted one day's reading of EKG's and at present has 3 days readings, as much as anyone else.

5. The Chancery Division's finding that Dr. Nanavati had not been accorded his rights with respect to a full hearing of the charges was affirmed by the Appellate Division of the Superior Court of New Jersey. *Nanavati v. Burdette Tomlin Memorial Hospital et al.,* No. A–3702–84T7, slip op. at 2 (App.Div. March 7, 1976) (*per curiam*).

§ 1981;[6] a claim by Dr. Nanavati against the Hospital, the Executive Committee and Dr. Sorenson pursuant to the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.,* and the New Jersey Antitrust Act, N.J.S.A. 56:9–1 *et seq.;* claims under New Jersey law for tortious interference with prospective economic business advantage by Dr. Nanavati and by Dr. Sorenson, each against the other; and defamation claims by the Hospital and Dr. Sorenson against Dr. Nanavati.

These claims were presented to the jury for decision by use of a set of 45 special interrogatories, which were drafted by the parties and the Court and submitted with the consent of all counsel.[7] The jury's determination, as molded by this Court, was as follows:

A verdict of "No Cause for Action" on Dr. Nanavati's § 1981 claim, *see* special interrogatory questions A1–A7; a verdict of "No Cause for Action" in favor of Dr. Sorenson on Dr. Nanavati's antitrust claim, but against the Hospital and its Executive Committee, in the amount of $350,000.00, which, tripled pursuant to the Sherman Act totalled $1,050,000.00, (B1–B11); a verdict of "No Cause for Action" in favor of Dr. Sorenson on Dr. Nanavati's claim against him for tortious interference with prospective economic advantage, (C1–C5); a verdict in favor of Dr. Sorenson and against Dr. Nanavati on Dr. Sorenson's claim for tortious interference with prospective economic advantage in the amounts of $100,000.00 as compensatory damages and $300,000.00 as punitive damages, (F1–F5); and, on the defamation claims by the Hospital and Dr. Sorenson against Dr. Nanavati, verdicts in favor of the Hospital in the amounts of $100,000.00 as compensatory

damages and $50,000.00 as punitive damages, and in favor of Dr. Sorenson against Dr. Nanavati in the amounts of $100,000.00 as compensatory damages and $500,000.00 as punitive damages. (D1–D7[2d] & E1–E8).

## II. DISCUSSION

Motions for a judgment notwithstanding the verdict are governed by Federal Rule of Civil Procedure 50(b), which provides:

> Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict.

The standard for granting a motion for j.n.o.v. is the same as for a directed verdict. *Skill v. Martinez,* 91 F.R.D. 498, 503 (D.N. J.1981). Such a motion is to be granted only when the evidence, exposed to the light which most strongly favors the party against whom the motion is directed, supports but one reasonable conclusion, and that conclusion contradicts the jury's verdict. *E.g., Hild v. Bruner,* 496 F.Supp. 93, 97 (D.N.J.1980).

---

**6.** Dr. Nanavati's discrimination claim originally also included a claim for discrimination due to race or national origin, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* At the conclusion of Dr. Nanavati's proofs, a motion for a directed verdict on this Title VII claim was made by the Hospital. In an opinion and order filed June 23, 1986, this Court granted the motion on the ground that Dr. Nanavati, as a physician, was an independent contractor rather than an employee, and as such, his discrimination claim was not within the ambit of Title VII. In that same opinion, the Court,

pursuant to Fed.R.Civ.P. 50, took the defendants' motion for directed verdict with respect to Dr. Nanavati's § 1981 claim under advisement, thereby affording Dr. Nanavati the opportunity of demonstrating, to the jury's satisfaction, that his contractual rights were impaired by the defendants' intentional racial discrimination.

**7.** A copy of these special interrogatories and the jury's responses thereto is attached to this opinion as appendix A.

Motions for a new trial are governed by Federal Rule of Civil Procedure 59(a). This rule provides, in relevant part:

A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States ...

A district court may grant a new trial if doing so would prevent injustice or would correct a verdict which is palpably contrary to the clear weight of the evidence. *American Bearing Co., Inc. v. Litton Industries*, 729 F.2d 943, 948 (3d Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984); 6A J. Moore, *Moore's Federal Practice* ¶ 59.08[5], at 59–140, 59–152 (2d ed. 1982). In deciding whether the jury's verdict was against the weight of the evidence, a court should be careful not to substitute its judgment for that of the jury. A court is not free to reweigh evidence and set aside a jury verdict merely because it thinks another result is more reasonable. *E.g., Litman v. Massachusetts Mutual Life Ins. Co.*, 739 F.2d 1549 (11th Cir.1984); *Lanza v. Poretti*, 537 F.Supp. 777 (E.D.Pa. 1982). To do so would usurp the jury's prime function, *Borbely v. Nationwide Mutual Ins. Co.*, 547 F.Supp. 959, 980 (D.N.J. 1981), thereby eroding the party's Seventh Amendment and common law right to a trial by a jury of his peers. *Shushereba v. R.B. Industries, Inc.*, 104 F.R.D. 524, 527 (W.D.Pa.1985). The authority to grant a new trial, however, is within the broad discretion of the trial court. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980) (per curiam); *American Bearing, supra*, at 948.

### A. *Dr. Nanavati's Motions for a Judgment Notwithstanding the Verdict or a New Trial*

Dr. Nanavati contends that certain legal errors, and a record which shows that the jury's verdicts were against the weight of the evidence, require either entry of a j.n. o.v. or granting of a new trial on the defamation claims against him, Dr. Sorenson's tortious interference claim against him, and his own claim for race discrimination. We shall address each of these contentions in turn.

### 1. *Defamation claims*

Before delving into the specifics of Dr. Nanavati's contentions regarding the defamation verdicts, it is important to present some chronicle of the procedural history of the defamation claims against him.

On May 10, 1984, Dr. Sorenson filed a complaint against Dr. Nanavati alleging, *inter alia*, that Dr. Nanavati had defamed him. On April 8, 1986, this Court granted Dr. Nanavati's motion for summary judgment with respect to Dr. Sorenson's defamation claim on the ground that Dr. Sorenson had not pled his defamation claim with sufficient particularity, despite the passage of a significant period of time and the concurrent opportunity to supplement or amend his original complaint. Slip op. of April 8, 1986 at pp. 7–10. Shortly thereafter, Dr. Sorenson moved this Court to reconsider that decision to grant summary judgment. In so doing, he specifically requested that the defamation count be restored so that he might pursue a claim based on the allegedly defamatory statements contained in an article entitled "Nanavati: diagnosis led to death," which had been published in *The Sun*, an Atlantic County Newspaper, on May 11, 1983. *See* Dr. Sorenson's memorandum in support of motion for reconsideration at p. 4. We granted Dr. Sorenson's motion, ordering that the summary judgment granted in favor of Dr. Nanavati on Dr. Sorenson's claim be vacated insofar as it precluded Dr. Sorenson's action based on statements contained in the article entitled "Nanavati: diagnosis led to death." Slip op. of May 12, 1986. The alleged defamatory statements in the article, attributed to Dr. Nanavati, were as follows:

I was concerned about everyone's life after that, I saw that man (the patient's husband) and I had to cover up for this doctor (Sorenson).

[T]he "conservative interpretation" (referring to Dr. Sorenson) probably cost the patient her life.

How can Dr. Meister (the expert who reviewed Dr. Sorenson's reading of the EKGs) be right when the patient is dead[?]

The correct interpretation (of the EKGs) would have saved her life because a pulmonary embolism is fully treatable if it is diagnosed and quickly handled.

In addition to allowing an action on the above statements, this Court permitted Dr. Sorenson to supplement his pleadings, at trial, to assert an additional defamation claim. The statement upon which the additional claim was based was allegedly made in November of 1985 by Dr. Nanavati to a nurse, Anne O'Neil. Ms. O'Neil testified, on June 30, 1986, that Dr. Nanavati had referred to Dr. Sorenson as a "senile old doctor that had been there [at the Hospital] for twenty years killing patients."[8] Trial Transcript of June 30, 1986 at p. 160, lines 14 & 15.

BTMH filed a defamation claim against Dr. Nanavati on May 10, 1983 as a counterclaim to Dr. Nanavati's complaint against it. This defamation claim, as it went to the jury, was based on the following statements allegedly made by Dr. Nanavati:

The correct interpretation of EKGs would have saved her life because pulmonary embolism is fully treatable if it is diagnosed and quickly handled.

I never knew medicine could be so shallow (referring to the practice of medicine at BTMH).

Evidence was presented at trial that, with the exception of the statement allegedly made to Anne O'Neil and the alleged "so shallow" statement, which was apparently made only to Mr. Watson,[9] Dr. Nanavati made all of the above statements both to William Watson, a reporter for the *Atlantic City Press*, and to Don Russell, a reporter for *The Sun*. The articles which ensued from the conversations between Dr. Nanavati and these reporters were admitted into evidence in this case without objection.[10] The article by Mr. Watson, published on May 10, 1983 in the *Atlantic City Press*, entitled "Nanavati: Faces $1M. Countersuit," was admitted as Defendants' Exhibit 1297, and the article by Mr. Russell, published May 11, 1983 in *The Sun*, entitled "Nanavati: Diagnosis led to death," was admitted as Defendants' Exhibit 2153. In addition, the jury heard the testimony of William Watson, the recipient of the alleged slanderous statements and the author of the May 10, 1983 *Press* article.

As previously stated, after four days of deliberation, the jury found that Dr. Nanavati had, in fact, defamed both Dr. Sorenson and the Hospital. The jury's verdict in

---

**8.** Dr. Nanavati urges that we improperly allowed Dr. Sorenson to supplement the pleadings to assert a defamation claim based on the alleged statement to Ms. O'Neil. We ruled upon this issue in our *ad litem* opinion of July 10, 1986, a copy of which is attached hereto as appendix B, and we rely upon the discussion therein in rejecting Dr. Nanavati's contention here. We conclude now, as we did then, that the pleadings were properly supplemented to include the alleged statement to Anne O'Neil as part of Dr. Sorenson's defamation case.

**9.** The "so shallow" statement was contained in an *Atlantic City Press* article published on May 7, 1983 entitled "Dr. To Fight Until Reinstated," written by William Watson, and admitted as Defendants' Exhibit 1296.

**10.** More than three weeks after the verdict was returned in this case, counsel for Dr. Nanavati

informed the Court that Exhibit 1297, the May 10, 1983 *Atlantic City Press* article, mistakenly had attached to it a page of the May 11, 1983 *Sun* article which contained the above-noted alleged defamatory statements. *See* transcript of August 14, 1986 at pp. 4–8. Counsel for Dr. Sorenson, at oral argument on the present motions, explained that this mistake was of no consequence because the sole bases for Dr. Sorenson's defamation claims were the allegedly slanderous statements to reporter Watson, reporter Russell, and nurse O'Neil. Transcript of August 14, 1986 at pp. 22 & 29. Counsel stressed that Dr. Sorenson did not pursue, as part of his defamation claim, the allegedly libelous statements contained in the May 10, 1983 *Press* article or the May 11, 1983 *Sun* article. *Id.* We shall hold Dr. Sorenson to the representations of his counsel, and we shall proceed with the understanding that Dr. Sorenson's defamation claim is an action for slander.

favor of Dr. Sorenson awarded him $100,-000.00 as compensatory damages and $500,000.00 as punitive damages. *See* special interrogatory questions E7 & E8. With respect to the Hospital, the jury awarded $100,000.00 as compensatory damages and $50,000.00 as punitive damages. (D7 & D7[2d]).

### a. Listener's Understanding

■ On his post-trial motions, Dr. Nanavati first contends that the defamation plaintiffs, Dr. Sorenson and BTMH, failed to prove that the actionable defamatory words were understood in their defamatory sense by the listeners. He urges that the evidence in this case with respect to the listeners' understanding is so deficient that no rational jury could have inferred that the statements were understood in their defamatory meaning.[11]

After reviewing the evidence presented to the jury, we must reject Dr. Nanavati's contention. The jurors were clearly presented with the requisite minimum quantum of evidence from which they could infer that the listeners understood the statements made to them as defamatory. With regard to the statements made to the newspaper reporters, Mr. Watson and Mr. Russell, we hold that there was sufficient evidence in the record to support an inference regarding the reporters' understanding of the defamatory nature of the words used by Dr. Nanavati. Mr. Watson was called as a witness in this case, and his testimony presented the jury with a reasonable basis for inferring his understanding of Dr. Nanavati's statements. Similarly, although Mr. Russell did not testify at the trial, his article published in *The Sun* on May 11, 1983, quoting Dr. Nanavati's allegedly slanderous statements, which was admitted into evidence, displayed his understanding of the alleged slanderous statements in their defamatory sense. The jury's findings as to the meanings of the slander uttered to the reporters thus had sufficient support in the evidence.

With respect to the statement allegedly made by Dr. Nanavati to Ms. O'Neil, we also find ample support in the record for the jury's inference that the statement was understood to be defamatory. Although Ms. O'Neil's testimony with respect to this statement reveals that, upon hearing the statement, she verbally objected thereto, and even protested to Dr. Nanavati that such a view was only his opinion, *see* trial transcript of June 30, 1986 at p. 159, this evidence does not render unreasonable the jury's inference that Ms. O'Neil understood the words to be defamatory. Indeed, this evidence can clearly be said to *support* an inference that Ms. O'Neil fully understood the statement made to be defamatory, since she apparently felt that some protestation was appropriate. At the very least, a jury question was presented regarding Ms. O'Neil's understanding of the statements.

### b. Expression of Opinion

Dr. Nanavati has argued extensively that the statements made to reporters Watson and Russell are protected expressions of opinion. With respect to the statements made which resulted in the articles published on May 10, 1983 in the *Press*, and on May 11, 1983 in *The Sun*, we reject Dr. Nanavati's argument without further discussion.[12] In our *ad litem* opinion filed

---

11. The statements at issue here, by reason of the fact that they impugn the defamation plaintiffs in their business and profession, constitute slander *per se*. *See* Restatement (Second) of Torts § 573 (1981); W. Page Keeton, *Prosser and Keeton on the Law of Torts*, § 112, pp. 788, 790–92 (5th ed. 1984). The fact that they are defamatory *per se*, however, does not obviate the need to establish, to the jury's satisfaction, that the statements were understood to be defamatory. *See* Restatement (Second) of Torts, § 563. Instead, characterizing the statements as slander

*per se* merely relieves the defamation plaintiffs from having to prove special damages. Restatement (Second) of Torts, §§ 570 & 573.

12. Dr. Nanavati also contends that the allegedly defamatory statements made to these reporters, as reported in *The Sun* article, are not actionable because they are mere repetitions of earlier statements, which statements are now not actionable by operation of the statute of limitations. We find this argument unpersuasive. Each republication of a defamatory statement

July 10, 1986, we held that these statements were not protected expressions of pure opinion, *see* op. of July 10, 1986, infra, at p. 1249, and we have not been persuaded that this holding was erroneous.

■ With regard to the allegedly defamatory statement made to Mr. Watson to the effect that Dr. Nanavati "never knew medicine could be so shallow," Dr. Nanavati urges this Court to hold that this statement was improperly submitted to the jury, both because it was not asserted in the Joint Final Pretrial Order and because it is a protected expression of pure opinion. Although we recognize that this statement, in contrast to the other statements made to reporters which were submitted to the jury, was not asserted as a ground for defamation until the trial was underway—and therefore was not included within the Joint Final Pretrial Order and was not considered by the Court in our *ad litem* ruling regarding the actionable nature of the statements—we nonetheless cannot accept Dr. Nanavati's contention that a j.n.o.v. or a new trial is therefore required. Assuming, without deciding, that the statement at issue here would have been held to have been a protected expression of opinion, had it been submitted to this Court for ruling,[13] we shall not set aside the jury's verdict in favor of the Hospital on this basis. Dr. Nanavati's failure to timely raise this defense with respect to the "so shallow"

statement, after having been on notice that the Hospital intended to assert a defamation claim based thereon, *see* transcript of July 15, 1986 at p. 66–67, can be said to constitute a waiver of this defense. Moreover, after a thorough search of the record, we are convinced that no prejudice accrued to Dr. Nanavati by virtue of the submission of this statement to the jury. The evidence in this case is sufficient, without regard to the "so shallow" statement, to support the jury's verdict in favor of the Hospital on the defamation claim.

### c. Constitutional Malice

Dr. Nanavati next argues that there was insufficient evidence in the record to establish that he had the requisite constitutional malice at the time he made the statements found by the jury to be defamatory. Because such a state of mind was lacking, he argues, the award of punitive damages was improper.

■ It is hornbook law that in a defamation action a jury must find by clear and convincing evidence that the defamation defendant made an allegedly defamatory statement with knowledge of its falsity or in reckless disregard of its truth or falsity before it may award punitive damages, *e.g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 348–50, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789 (1974), and this Court so instructed the jury.[14] It was then the re-

---

constitutes a separate publication, and gives rise to a separate cause of action. *See* Restatement (Second) of Torts § 578, com. b. *See also id.* at § 576; *Toanone v. Williams,* 405 F.Supp. 36, 38 (E.D.Pa.1975) (applying Pennsylvania law); W. Page Keeton, *Prosser and Keeton on the Law of Torts,* § 113 at p. 799 (5th ed. 1984).

13. A very substantial question regarding the "opinion" status of the statement at issue is raised with respect to whether or not the statement can fairly be said to imply the existence of undisclosed defamatory facts. *See* op. of July 10, 1986, infra, at pp. 1248–50.

14. The jury was charged, in pertinent part:

Now, with regard to awarding punitive damages, members of the jury, I must inform you that the defamation claims made against Dr. Nanavati require a special showing of the strength of the evidence before you may

award punitive damages. To award punitive damages to either the hospital or Dr. Sorensen [sic] based on what Dr. Nanavati said about them which you find to be defamatory, you must find by clear and convincing evidence that Dr. Nanavati made the defamatory communications [sic] knowing that it was false or in reckless disregard for its truth or falsity.

Clear and convincing evidence is that evidence which produces in the minds of the jurors a firm belief or conviction as to the truth of the allegations sought to be established. That is evidence so clear, direct and convincing as to enable the jury to come to a clear conviction without hesitancy of the truth of the precise facts in issue.

With respect to reckless disregard of the truth of [sic] falsity, if you find that Dr. Nanavati entertained serious doubts about the truth of his statements about the hospital or

sponsibility of the jury, having heard the testimony and observed the manner and demeanor of the witnesses in order to assess credibility, to weigh the evidence and ultimately to reach a determination regarding whether Dr. Nanavati possessed the requisite state of mind to be held responsible in punitive damages. The jury clearly found that he did, awarding the defamation plaintiffs a total of $550,000.00 in punitive damages. *See* special interrogatory questions D7[2d] & E8. We are now called upon to review the record to assure that sufficient evidence exists to support that finding. Having done so, we hold that there was ample evidence presented from which the jury could rationally find that Dr. Nanavati's statements were made in reckless disregard of the truth or falsity thereof.[15] Accordingly, we reject Dr. Nanavati's argument that he is entitled to have the punitive damage awards set aside.

### d. Falsity and Abuse of Privilege

■ Dr. Nanavati also urges that the record lacks the minimum quantum of proof to support the jury's findings that the alleged defamatory statements contained in the May 11, 1983 *Sun* article (which were orally conveyed to reporters Russell and Watson by Dr. Nanavati) were false, *see* special interrogatory questions D1 & E1, and that he abused his qualified privilege in making said statements.[16] (D5, D6, E5 & E6). Again, our review of the record leads us to disagree. We conclude

that there is sufficient basis in the record for the jury to find that the alleged defamatory statements were false and that Dr. Nanavati, in making the statements, abused his qualified privilege.

### e. Entire Controversy Doctrine

Dr. Nanavati next contends that the Hospital's defamation claim against him should not have been heard in this federal action by virtue of the New Jersey state court "entire controversy" doctrine, which provides that all matters in controversy between parties are to be disposed of in a single action. *E.g.; New Jersey Highway Authority v. Renner*, 18 N.J. 485, 492, 114 A.2d 555 (1955). In support of this argument, however, Dr. Nanavati cites no authority for the proposition that this Court is required to apply that New Jersey doctrine, and nothing has been presented which suggests that a federal court is precluded from hearing a pendant state law claim by operation of such a doctrine. Although of course it is true that there is a federal policy in favor of judicial economy and against claim splitting, we have determined that such judicial economy was best served in this case by disposing of all outstanding claims by the parties in this federal forum. Nothing presented upon these motions persuades us that some other treatment of the state law claims was more appropriate.[17]

---

Dr. Sorensen [sic] then you must find that he made them with reckless disregard as to their truth or falsity.
Tr. of July 15, 1986 at pp. 55–56.

**15.** The jury's finding regarding the existence of "constitutional malice" obviates the need for protracted discussion of another of Dr. Nanavati's asserted bases for new trial. This Court, during trial, ruled that Dr. Sorenson and the Hospital were not public figures for purposes of their defamation claims against Dr. Nanavati. Dr. Nanavati claims, herein, that this ruling constituted prejudicial error, requiring a new trial. The jury found, however, that Dr. Nanavati made the defamatory statements with constitutional malice—with knowledge of the falsity or in reckless disregard of the truth or falsity of the statements. Thus even if the jury had been

instructed that Dr. Sorenson and the Hospital were public figures, liability would nonetheless have attached. In short, accepting, *arguendo*, that our ruling regarding the public figure status of these defamation plaintiffs was erroneous, it still cannot be said to have prejudiced Dr. Nanavati in defending the claims against him.

**16.** Dr. Nanavati has also asserted, on this motion, that the Hospital failed to prove special damages on its defamation claim. We held, in our *ad litem* opinion of July 10, 1986, that such proof was not required and therefore we do not address this contention here.

**17.** Indeed, there is some cause for doubt whether the Hospital's defamation claim had even accrued at the time the Hospital filed its counterclaim in the state court action.

### 2. Dr. Sorenson's Tortious Interference Claim

Dr. Nanavati also seeks a judgment notwithstanding the verdict on Dr. Sorenson's tortious interference claim. He urges that the jury's verdict, as to both liability and damages, is legally insufficient and should be set aside. The elements for the tort of tortious interference, discussed in *Zipper-tubing Company v. Teleflex, Inc.*, 757 F.2d 1401, 1409–12 (3d Cir.1985), were set forth in the jury charge as follows:

> In order for ... Dr. Sorensen [sic] to recover damages on this claim, first, he must prove existence of a reasonable expectation of economic advantage or benefit belonging to him. Second, that the other doctor had knowledge of that expectation of economic advantage. Third, that the other doctor wrongfully and without justification interfered with his reasonable expectation of economic advantage or benefits. Fourth, that in the absence of the alleged wrongful act of the other doctor it is reasonably probable that he would have realized his economic advantage or benefit, and fifth, that he sustained damages as a result of this activity.

Transcript of July 15, 1986, at pp. 38–39, lines 18–7.

■ Although Dr. Nanavati contends that there was no evidence of a causal connection between his actions and the subsequent harm to Dr. Sorenson's business, our review of the record reveals that this argument is without merit. It was well within the province of the jury to conclude that, despite other possible reasons for Dr. Sorenson's business decline, Dr. Nanavati's conduct was a proximate cause thereof. Sufficient evidence was presented from which such an inference could be drawn, and we shall not usurp the jury's function by concluding otherwise.

■ Dr. Nanavati also contests the jury's award of $100,000.00 as compensatory damages on Dr. Sorenson's tortious interference claim. Specifically, he urges that the record lacked the minimum quantum of evidence from which the jury could have found that Dr. Nanavati's tortious behavior caused Dr. Sorenson $100,000.00 in actual damages. The law is quite clear, however, that when a party has been damaged by the legal wrong of another, he shall not be denied recompense merely because the exact amount of damage is uncertain. *E.g., Kyriazi v. Western Electric Co.*, 465 F.Supp. 1141, 1146 (D.N.J.1979). A jury's damage award will be sustained if, though not mathematically precise, it constitutes a reasonable estimate without speculation or conjecture. *E.g., First National Bank of Chicago v. Jefferson Mortgage Co.*, 576 F.2d 479, 494–95 (3d Cir. 1978). Despite Dr. Nanavati's protestations to the contrary, we are convinced that the jury's award of $100,000.00 in compensatory damages to Dr. Sorenson on his tortious interference claim was not the product of guesswork, but was a reasonable estimate of damages based on the evidence presented.[18]

### 3. Dr. Nanavati's § 1981 Discrimination Claim

Dr. Nanavati urges that a new trial is mandated on his § 1981 claim because the jury's finding that no racial discrimination occurred is against the clear weight of the evidence. This assertion is wholly without merit. Having reviewed the record, we hold that there was substantial evidence from which the jury could have reasonably concluded that Dr. Nanavati was not treated differently because of his race. It is not

---

**18.** Dr. Nanavati also contends that the awards made to Dr. Sorenson on his business interference claim, as well as those to Dr. Sorenson, the Hospital, and its Executive Committee on the defamation claims, were so excessive as to require a new trial. We cannot agree, and shall deny Dr. Nanavati's request for a new trial based on that contention. With respect to the punitive damages awarded, testimony was adduced to show that Dr. Nanavati has a net worth in excess of $1,622,410.00, tr. of July 7, 1986 at p. 65, and an annual gross income approaching $500,000.00. Tr. of July 7, 1986 at p. 30. On this record, we cannot say that the awards made are excessive.

our function, on these motions, to substitute our judgment for that of the jury, and we decline to do so.

### 4. *Evidentiary Ruling on Rebuttal Testimony*

■ Dr. Nanavati contends that it was prejudicial error to preclude Dr. David Volpi, a former emergency room physician and a rebuttal witness, from testifying as to his conversations with Dr. Gus Engstrom, the director of the emergency room. The offer of proof made by Dr. Nanavati was that Dr. Volpi would testify essentially as follows: In or about August 1983, Dr. Volpi was told by Dr. Engstrom that he was referring too many patients to Dr. Nanavati, and that Dr. Sorenson had discussed this with Dr. Engstrom. Dr. Nanavati's attorney, during his direct examination of Dr. Volpi, tried to elicit that testimony in the following manner:

Q: And let me direct your attention to in or about August of 1983. Did you have a conversation with Dr. Engstrom about your referral of cases to Dr. Nanavati?

A: Yes, I did.

Trial transcript of July 9, 1986 at p. 107 lines 19–23. Upon objection, this Court ruled that the witness' recitation of Dr. Engstrom's comments would constitute inadmissible hearsay testimony. Counsel, as a result of the Court's ruling, pursued the following line of questioning without objection:

Q: As a result of this conversation with Dr. Engstrom, did you change your referral patterns to Dr. Nanavati?

A: Yes, I did.

Q: What did you do?

A: I decreased the amount of patients I referred to him.

Trial transcript of July 9, 1986 at p. 108, lines 7–14.

For the first time, Dr. Nanavati contends that our ruling sustaining the hearsay objection was "erroneous and prejudicial to [his] ability to tie Dr. Sorenson in to the group boycott which the jury found involved the Hospital and the Executive Committee." Dr. Nanavati's amended brief at p. 26.

Upon review of the ruling we conclude that Dr. Volpi's proffered testimony regarding Dr. Engstrom's conversation was properly excluded. While it is possible that Dr. Engstrom may be an agent of the Hospital for some purposes, and as such his statements would be admissible under Fed.R.Evid. 801(d)(2)(D), relaying messages from non-emergency room physicians to emergency room physicians about emergency room referrals was not an activity within the scope of Dr. Engstrom's agency. Further, the record did not demonstrate a sufficient nexus between Dr. Sorenson and the "conspiracy" to permit the introduction of Dr. Volpi's hearsay testimony pursuant to Fed.R.Evid. 801(d)(2)(E) (admissibility of statements by co-conspirators). Finally, to the extent that Dr. Sorenson's alleged statement was merely cumulative of evidence presented in the direct case, we find that no possible prejudicial harm could have accrued to Dr. Nanavati.

### B. *BTMH and the Executive Committee's Motions for Judgment Notwithstanding the Verdict or a New Trial*

■ BTMH and the Executive Committee have moved for judgment notwithstanding the verdict with respect to Dr. Nanavati's antitrust claims, alleging prejudicial legal error by this Court[19] and proofs insufficient, as a matter of law, to support the jury's verdict. For the reasons which fol-

---

**19.** The most significant of these alleged legal errors was this Court's decision, as set forth in our *ad litem* opinion of June 24, 1986, allowing Dr. Nanavati to amend his pleadings, at the close of his case, to name the Hospital and the Executive Committee as defendants on the antitrust claim. Although we consider this allegation of error somewhat questionable, particularly in light of the antitrust defendants' refusal to accept the opportunity afforded them to cure potential prejudice at the time of trial, *see* slip op. of June 24, 1986 at pp. 6–7 (D.N.J.), we need not rule upon this issue. Because we hold that judgment in favor of the Hospital and the Executive Committee must be entered, notwithstanding the jury's verdict, this assertion of prejudicial error, like the others pertaining to the antitrust claim, is moot.

low, this Court, cognizant of our obligation not to substitute our judgment for that of the jury, feels constrained to agree with the antitrust defendants that a judgment of "No Cause for Action" must be entered against Dr. Nanavati on the antitrust claims, notwithstanding the jury's verdict.

After hearing 8 weeks of testimony, deliberating 4 full days, and requesting and receiving a complete recharge on antitrust law, the jury found that Dr. Sorenson, the sole individual charged with an antitrust violation, had not participated in any antitrust violation. Notwithstanding this finding, the jury also found that a contract, combination or conspiracy in restraint of commerce existed, special interrogatory question B–1, and that the two remaining antitrust defendants, BTMH and the Executive Committee, were participants therein. (B2 & B3). Despite a thorough review of the record, we are unable to find evidence in this case to support a finding that the Hospital and the Executive Committee, the defendants who were not exonerated by the jury, committed a violation of the antitrust laws. Specifically, in light of the jury's exoneration of Dr. Sorenson, the record is devoid of evidence to support a finding that either the Hospital or the Executive Committee participated in any conspiracy designed to stifle competition or engaged in any unlawful restraint of trade which had an anticompetitive effect.

Because we were extremely reluctant to set aside any portion of the verdict in this enormously complicated case, we have made every effort to preserve the jury's findings and decision. We have carefully searched the voluminous record of this case in an effort to locate evidence to support a finding that BTMH and the Executive Committee participated in a conspiracy violative of the antitrust laws, and we have attempted to discern, in the absence of more explicit jury findings,[20] the basis for the jury's apparent conclusion[21] that a contract, combination or conspiracy in restraint of interstate commerce existed. Our attempts to locate evidence from which a rational factfinder could conclude that the Hospital and the Executive Committee participated in such a conspiracy, while Dr. Sorenson did not, have been futile. We are convinced that judgment must be entered in favor of BTMH and the Executive Committee on the antitrust claim.[22] There is simply no evidence in this case which supports the imposition of liability for an antitrust violation against BTMH or the Executive Committee, in light of the jury's rejection of Dr. Nanavati's original theory that Dr. Sorenson influenced or masterminded the alleged anticompetitive activities.

In our effort to preserve the jury's verdict, we have considered a number of alternative legal theories which might support the imposition of liability against the defendants herein, but have found that our attempts to locate factual bases for these theories in the record have been unavailing. We shall discuss each theory in turn.

The most obvious interpretation of the jury's responses to the antitrust special interrogatories, and the one which the defendants urge upon the Court, is the finding that BTMH *conspired with* the Executive Committee. Such a factual finding, defendants contend, would result in the need for this Court to "mold" the jury's

---

**20.** Our authority to attempt such a determination, given the parties' decision not to submit a special interrogatory which specifically asked the jury whether persons who were not named as defendants in the action participated in the alleged conspiracy, cannot seriously be disputed in light of Fed.R.Civ.P. 49, which provides for express fact-finding by the trial court when the parties have failed to properly submit any issue to the jury.

**21.** Of course, in light of the record here, we cannot help but consider the possibility that the jury in this case, after 8 weeks of trial and 4 days of deliberation, reached a compromise in the verdict.

**22.** Dr. Nanavati was permitted, when allowed to amend his complaint, to include an antitrust claim under New Jersey law, N.J.S.A. § 56:9–1 *et seq.*, as well as federal law. *See* slip op. of June 24, 1986 (D.N.J.) at p. 2, n. 2. For purposes of the present motion, however, no party has argued that any difference exists between the state law and the federal law, and therefore we need not differentiate between these claims.

verdict to reach a verdict of "No Cause for Action." Defendants rely, in making this argument, on *Weiss v. York Hospital,* 745 F.2d 786 (3d Cir.1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985), in which the Third Circuit held that the medical staff of the hospital[23] and the hospital itself could not, as a matter of law, "conspire" with one another. 745 F.2d at 817. The medical staff involved in the *Weiss* case had been empowered to make staff privilege decisions on behalf of the hospital, and in making such decisions, the Third Circuit explained, the medical staff therefore acted as an officer of the corporate hospital. 745 F.2d at 817. Since the medical staff, as an entity, had no "interest in competition with the hospital," *id.,* there could not be, as a matter of law, a conspiracy between the medical staff and the hospital with respect to staff privilege decisions. In keeping with the reasoning in *Weiss,*[24] the jury in the present case was charged that BTMH and the Executive Committee could not, as a matter of law, conspire with one another.[25] Not having been persuaded that this charge was incorrect, we hold that the jury's verdict with respect to the antitrust claim, if indeed it is based upon a finding that the Executive Committee and the Hospital conspired, cannot stand. Particularly in light of the fact that the jury was instructed *twice* on this

point, however, we are unwilling to assume that the jurors' intent was to find a conspiracy between these two defendants regarding the termination of Dr. Nanavati's staff privileges. Instead, on this motion, we have attempted to discern alternative interpretations for the jury's interrogatory answers, including considering the possibility that the jury found separate or distinct antitrust violations for each defendant.

With respect to the Executive Committee, the single ground asserted by Dr. Nanavati which presents even a colorable antitrust claim is the Executive Committee's decision to recommend that Dr. Nanavati's staff privileges be terminated. This decision, made as it was by a "combination" of individual competitors, could, under *Weiss, supra,* at 814, support antitrust liability without regard to the involvement of any other entity. In order to impose antitrust liability, however, more is required than just proof of some action taken by the group. The action taken must have been one which was anticompetitive. If this were not so, *every* action taken by the "combination" would be violative of the antitrust laws.[26] Such a result could not be countenanced, of course where, as here, there are legitimate reasons for the exist-

---

**23.** We have not identified, nor have the parties urged us to find, any legally significant difference between the full medical staff, the defendant at issue in *Weiss,* and the Executive Committee of the Medical Staff, the defendant entity at issue here.

**24.** Although there is an apparent difference between the decision-making process employed at the hospital involved in *Weiss,* where the medical staff makes privilege decisions, and that at BTMH, where the Executive Committee of the Medical Staff is empowered only to make recommendations regarding staff privileges, none of the parties has argued that *Weiss* is distinguishable by virtue of this difference, and we attach no legal significance thereto. *See generally,* Kissam, Webber, Bigers and Holzgraefe, *Antitrust and Hospital Privileges: Testing the Conventional Wisdom,* 70 Calif.L.Rev. 595, 603–613 (1982).

**25.** The jury was charged, in pertinent part:
"In order to prove the first element Dr. Nanavati must prove that two or more dis-

tinct entities agreed to take action against him. Bear in mind that the hospital and its medical staff cannot conspire between and among themselves in violation of the Sherman Act."
Tr. of July 15, p. 29, lines 7–12; Tr. of July 16, p. 6, lines 6–11. No exception was taken to this portion of the charge.

**26.** The language used by the *Weiss* court arguably suggests this result, since the court stated that " ... *any* action taken by the medical staff satisfies the 'contract combination, or conspiracy' requirement of section 1." 745 F.2d at 814 (emphasis added). The present case is clearly distinguishable from *Weiss,* of course, in that the circumstances of *Weiss,* wherein osteopathic doctors, as a class, were purportedly excluded from admission to a medical staff by the allopathic doctors already on the staff, presented, in contrast to the circumstances of this case, a situation rife with economic competition.

ence of the organized group of competitors.[27]

In order for the action taken by an antitrust defendant to be considered one which constitutes a violation of the antitrust laws, that action must be anticompetitive in purpose or effect. *E.g., McLain v. Real Estate Board of New Orleans,* 444 U.S. 232, 243, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980). *See also Tose v. Pennsylvania Bank,* 648 F.2d 879, 892 n. 17 (3d Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). Thus, the Executive Committee's recommendation that Dr. Nanavati's staff privileges be revoked would conceivably be an acceptable predicate for antitrust liability if it were anticompetitive in purpose or effect. Nothing in the record of this case, however, supports a finding that the Executive Committee's action, irrespective of how unreasonable the jury might have believed it to be, was motivated by an anticompetitive purpose or had an anticompetitive effect, as these terms are defined in antitrust law.

There is a complete dearth of evidence to support an inference that the Executive Committee, as an entity, had any anticompetitive motive or purpose with respect to its recommendation concerning Dr. Nanavati's staff privileges. Furthermore, there is no evidence that any of the individuals who served as members of the Executive Committee were, as individual physicians, motivated in any respect by any desire for personal economic gain.[28] On such a record there is obviously no rational basis for concluding that the Executive Committee acted with an anticompetitive animus.

Dr. Nanavati has argued, in opposition to defendants' present motion, that proof of an anticompetitive effect is sufficient to support the imposition of liability under the Sherman Act even without a showing of anticompetitive purpose. Dr. Nanavati's amended brief in opposition to defendants' motions at p. 18. Accepting as true the proposition that the antitrust law requires proof only of either anticompetitive purpose *or* effect, *but cf., Borger v. Yamaha International Corp.,* 625 F.2d 390, 397 & n. 4 (2d Cir.1980) (expressing doubt whether the "purpose or effect" requirement "is a disjunctive rule"), we are nonetheless unable to find evidence in this case which supports the imposition of liability against either the Hospital or the Executive Committee for an antitrust violation arising out of the revocation of Dr. Nanavati's staff privileges. The record simply does not permit a finding that the decision to revoke Dr. Nanavati's staff privileges produced anticompetitive effects.

Although it is of course true that the termination of Dr. Nanavati's staff privileges would have had a deleterious effect on his ability to treat cardiac patients within Cape May County who required hospitalization,[29] it is equally true that this effect alone, in the absence of an anticompetitive intent, cannot support a verdict against the entities causing the effect. The antitrust laws are designed to protect *competition,* not *competitors. E.g., Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). Nothing in this case supports a finding that the revocation of Dr. Nanavati's privileges was either motivated by a desire to stifle competition or that it substantially impaired competition. It is uncontroverted that, with the possible exception of Dr. Sorenson, *see* trial transcript of June 2, 1986 at p. 73, lines 19–21; trial transcript of June 4, 1986 at p. 16, lines 18–21, *but cf.,* trial transcript of June 5, 1986 at pp. 97–98, lines 17–5 (Dr. Sorenson sent Dr. Nanavati

27. The legitimacy of the formation of an executive committee of the medical staff and the delegation of authority to that committee to recommend decisions regarding staff privileges is beyond dispute.

28. Indeed, even the existence of a *potential* for economic gain by the Executive Committee members cannot be found in this record. No direct economic incentive to stifle competition existed, since none of these physicians practiced cardiology, and no indirect economic incentive of any kind was proven.

29. As a factual matter, we note that Dr. Nanavati, by virtue of his attainment of a temporary restraining order—and then a permanent injunction—from the New Jersey Superior Court, was without staff privileges for only 5 days.

flowers as a welcoming gift), all of the persons involved in this matter believed in the need for and/or desired to have an additional cardiologist engaged in practice within Cape May County. Dr. Nanavati's own testimony was that he was welcomed with open arms by the other physicians. *See* trial transcript of June 4, 1986 at p. 16, lines 22–24. The proofs do not support an inference, unless such is drawn solely from the fact that the Hospital and the Executive Committee acted to revoke Dr. Nanavati's staff privileges, that the Hospital and the Executive Committee's activities substantially impaired competition or unreasonably restrained trade. Indeed, the evidence adduced at trial belies any such inference. With respect to Dr. Nanavati's own practice, it is uncontested that the number of patients he treats rose from approximately 1200 at the time of the filing of the original complaint in this action to 4,000 at the time of the trial. Trial transcript of June 13, 1986, pp. 82–85. Furthermore, the proofs showed that a new cardiologist, Dr. Mark Sorenson, entered the "market" during the time period critical to this case.

With respect to the potential liability of the Hospital, we have considered the possibility that an entity other than the Executive Committee, such as an individual physician, might have been found by the jury to have engaged in a conspiracy with the Hospital. Our review of the record of this case, however, again leaves us convinced that no evidence supports the conclusion that the Hospital committed any violation of the antitrust laws, even under this theory.

In keeping with the current state of the law regarding intracorporate conspiracy, *see e.g., Weiss, supra,* at 813 n. 43 (citing *Johnston v. Baker,* 445 F.2d 424, 426–27 (3d Cir.1971) (corporate officers or employees, if they act for their own interests, and outside the interests of the corporation, are legally capable of conspiring with their employer for purposes of § 1 of Sherman Act)), this Court charged the jury, in relevant part, that:

> As heretofore stated, in order for you to find that a conspiracy existed under the Sherman Act, you must determine that at least two independent persons or entities took part in the alleged conspiracy. A corporation cannot conspire with itself any more than a private individual can. And it is the general rule that the acts of the agent are the acts of the corporation. Therefore, the Sherman Act does not prohibit an agreement combination or conspiracy, which consists merely in the fact that the officers and other agents of the hospital did their day-to-day jobs of formulating and carrying out its policies. Burdette Tomlin is a corporation. And as such it can act only through its officers and representatives. It does not violate the Sherman Act when it exercises its rights through its officers and agents, which is the only medium through which it can possibly act.
>
> However, if you find that one or more of the individual physicians at the hospital acted in regard to Dr. Nanavati in whole or in part for private economic motives, then you may find that a conspiracy existed.

Trial transcript of July 15, 1986, pp. 32–33, lines 18–15; tr. of July 16, 1986, pp. 9–10, lines 22–21.[30]

The jury's responses to the special interrogatories indicated their finding that the

---

**30.** The Hospital excepted to this point of the charge, tr. of July 15, 1986 at p. 77, lines 5–11, and despite the fact that this charge had been submitted by plaintiff as a proposed point for charge, and that the Hospital had not previously objected, informed this Court during oral argument on the present motion that it was surprised to hear this point in the jury instructions. Tr. of August 14, 1986 at p. 63. Defendants also argued on this motion, for the first time, that plaintiff was required to *identify* the specific conspirators who were not named defendants. *See* defendants' supplemental brief at p. 5. Our holding here is based upon the lack of factual support for a finding that any such independent co-conspirator existed, not upon a change in belief with respect to the accuracy of the charge as a statement of the law. We do not reach defendants' assertions regarding a need for plaintiff to specifically identify unnamed conspirators.

antitrust violation took the form of a group boycott, special interrogatory question B6, and that this boycott was motivated by Dr. Nanavati's "unprofessional behavior or violations of public service or other ethical norms." (B–7). These findings, which were elicited by the special interrogatories in order to discern whether the "rule of reason" approach to analyzing the alleged anticompetitive activity should be implemented, *see* slip op. of July 8, 1986 (*ad litem* ),[31] might suggest that the jury found that a group boycott existed with respect to the referral of patients to Dr. Nanavati. A significant amount of testimony was elicited during the trial regarding the alleged decrease in the number of patient referrals Dr. Nanavati was receiving. This evidence, taken in the light most favorable to Dr. Nanavati, might, of course, support at least a preliminary inference that this decrease in referrals was the result of anticompetitive activity.[32] Any such boycott involving referrals, however, would obviously have to have been shown to implicate one of the named defendants in this case in order to support the imposition of antitrust liability. Because we have been unable to locate evidence in the record which constitutes such a showing, and we note that Dr. Nanavati has not even argued, on this motion, that the Hospital (or its Executive Committee) was implicated in any such conspiracy regarding referrals, we find no basis for a verdict on the antitrust claim against the Hospital or the Executive Committee arising from any decrease in patient referrals. Moreover, there was considerable testimony by several members of the Medical Staff, some of whom were his friends and neighbors who had for some time referred hundreds of patients to Dr. Nanavati for cardiac consultation and care, and had ceased to do so. Their reasons advanced for so doing were his failure to report his findings to them, his costly fees, his subjecting the patients to numerous unnecessary and expensive tests, his treatment of them for non-cardiac conditions and then failure to return for general practice care resulting in their loss of patients. *See* e.g., trial transcripts of June 24, 1986 at pp. 40–43, 57–62, of June 25, 1986 at pp. 5–19, 24–27, and of June 30, 1986 at pp. 88–92.

Dr. Nanavati relies heavily, in support of his argument that liability under the antitrust laws can properly be imposed against the Hospital in this case, on the fact that the Hospital contracted with a pulmonary specialist, Dr. Henry J. Komansky, for the exclusive official reading and interpretation of stress tests and echocardiograms. *See* Dr. Nanavati's amended brief in opposition to defendants' motions at p. 9. For reasons substantially similar to those just expressed with regard to the termination of staff privileges, this exclusive contract cannot, on the record of this case, support a verdict against the Hospital. In the absence of evidence of an anticompetitive intent with respect to entry into the contract, antitrust liability might be imposed against the Hospital only if its activity had an anticompetitive effect. The touchstone for antitrust liability is the ultimate effect on *competition,* not that on individual competitors, and the record is devoid of factual bases on which to ground liability against the Hospital. Mere proof of the fact that a hospital entered into an exclusive contract for certain professional services is not, in itself, proof of an unreasonable anticompetitive effect. *See, e.g., Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 29 n. 48 & 30 n. 51, 104 S.Ct. 1551, 1567 n. 48 & 1568 n. 51 (1984). Exclusive service contracts are not illegal, nor are they

**31.** No objection or challenge to our ruling on the issue of the appropriate approach to analyzing anticompetitive behavior in the circumstances of this case, as discussed in our July 8, 1986 *ad litem* opinion, a copy of which is attached hereto as appendix C, has been raised on the present motion.

**32.** We do not reach the issue whether sufficient evidence was adduced to sustain a verdict based upon this inference. Whether the alleged decrease in referrals was in fact the product of *concerted* activity by the other physicians, and whether any physician's decision to decrease referrals was based on reasons which were not legitimate, are, of course, issues properly within the jury's province.

uncommon in a hospital setting. It is uncontroverted that the Hospital was not legally required to put such contracts out for open bid, and there was, in this case, absolutely no proof that the decision to award an exclusive contract to Dr. Komansky and his medical group was either motivated by an anticompetitive purpose or that the award of that contract had an anticompetitive effect. In short, there is no evidence here to support the imposition of antitrust liability against the Hospital based on its decision to award an exclusive contract to Dr. Komansky's medical group nor against the Hospital or the Executive Committee for any other valid reason. Accordingly, we are of the belief that all we have here is an unfortunate personal feud between Drs. Nanavati and Sorenson.

## III. CONCLUSION

For the reasons expressed in this opinion, our rulings on the present motions are as follows: the motion for j.n.o.v. and new trial made by Dr. Nanavati shall be denied. The motion for j.n.o.v. by the Hospital and the Executive Committee shall be granted. The judgment previously entered in favor of Dr. Nanavati against said defendants, in the amount of $1,050,000.00, shall be vacated, and a judgment of No Cause for Action shall be entered in lieu thereof. The Court shall enter an appropriate order.

### APPENDIX A

| | | |
|---|---|---|
| | : | Hon. Mitchell Cohen |
| | | U.S. District Court |
| SUKETU H. NANAVATI, M.D., | : | District of New Jersey |
| | | |
| v. | : | |
| | | |
| BURDETTE TOMLIN MEMORIAL HOSPITAL, | : | |
| THE EXECUTIVE COMMITTEE OF THE MEDICAL | | No. 83-0793 |
| STAFF OF BURDETTE TOMLIN MEMORIAL | : | |
| HOSPITAL, and | | |
| DR. ROBERT J. SORENSEN, M.D. | : | |
| | | |
| _____ | : | |
| | | |
| | : | |
| DR. ROBERT J. SORENSEN, M.D., | | |
| | : | |
| v. | | No. 84-1790 |
| | : | |
| SUKETU H. NANAVATI, M.D. | | |
| | : | |
| | | |
| _____ | : | |

# SPECIAL INTERROGATORIES

## SECTION A: Dr. Nanavati's Racial Discrimination Claim

**A1.** Was racial discrimination a substantial factor in the process of revocation of Dr. Nanavati's medical staff privileges at the Hospital?

Yes _____

No __✓__

## IF YOUR ANSWER TO QUESTION A1 IS YES, ANSWER QUESTION A2. OTHERWISE GO ON TO QUESTION A3

**A2.** (a) Did the Hospital participate in such racial discrimination?

Yes _____

No _____

(b) Did the Executive Committee participate in such racial discrimination?

Yes _____

No _____

(c) Did Dr. Sorensen participate in such racial discrimination?

Yes _____

No _____

**A3.** Was racial discrimination against Dr. Nanavati a substantial factor in the decision by the Hospital to enter into an

■■■■■■■■■■
■■■■■■■■

· exclusive contract with Dr. Komansky's group for the reading and interpreting of echocardiograms and stress tests?

Yes _____

No __✓__

## IF YOUR ANSWER TO QUESTION A3 IS YES, ANSWER QUESTION A4, OTHERWISE GO ON TO QUESTION A5

**A4.** (a) Did the Hospital participate in such racial discrimination?

Yes _____

No __✓__

(b) Did the Executive Committee participate in such racial discrimination?

Yes _____

No __✓__

(c) Did Dr. Sorensen participate in such racial discrimination?

Yes _____

No __✓__

## IF YOUR ANSWER TO EITHER QUESTION A1 OR A3 IS YES, ANSWER QUESTION A5, OTHERWISE GO ON TO SECTION B

**A5.** Was Dr. Nanavati damaged by such racial discrimination?

Yes _____

No __✓__

**IF YOUR ANSWER TO QUESTION A5 IS YES, ANSWER QUESTION A6. OTHERWISE GO ON TO SECTION B**

**A6.** What is the amount of damages you award for the harm caused to Dr. Nanavati by the racial discrimination?

$ _____

**A7.** If you find that punitive damages should be awarded by reason of such discrimination, set forth the amount of such punitive damages you find as to each defendant (only if you have answered yes as to that defendant in either Question A2 or A4):

Hospital $ _____

Executive Committee $ _____

**SECTION B: Dr. Nanavati's Antitrust Claims**

**B1.** Was there a contract, combination, or conspiracy in restraint of interstate commerce?

Yes ___✓___

No _____

**IF YOUR ANSWER TO QUESTION B1 IS YES, ANSWER QUESTION B2. OTHERWISE, GO ON TO SECTION C**

**B2.** Was the Hospital part of the contract, combination, or conspiracy?

Yes ___✓___

No _____

**B3.** Was the Executive Committee part of the contract, combination, or conspiracy?

Yes __✓__

No _____

**B4.** Was Dr. Sorensen part of the contract, combination, or conspiracy?

Yes _____

No __✓__

## IF YOUR ANSWER TO ANY OF QUESTIONS B2 OR B3 OR B4 IS YES, ANSWER QUESTION B5. OTHERWISE GO ON TO SECTION C

**B5.** Did any of the participants perform any act in furtherance of the contract, combination, or conspiracy?

Yes __✓__

No _____

## IF YOUR ANSWER TO QUESTION B5 IS YES, ANSWER QUESTION B6. OTHERWISE GO ON TO SECTION C

**B6.** Did the contract, combination, or conspiracy take the form of a group boycott?

Yes __✓__

No _____

## IF YOUR ANSWER TO QUESTION B6 IS YES, ANSWER QUESTION B7. OTHERWISE GO ON TO QUESTION B8

**B7.** Was Dr. Nanavati boycotted because of unprofessional behavior or violations of public service or other ethical norms?

Yes _√_

No ____

**IF YOUR ANSWER TO QUESTION B7 IS YES, ANSWER QUESTION B8, OTHERWISE GO ON TO QUESTION B9**

**B8.** Did the contract, combination, or conspiracy constitute an unreasonable restraint on interstate commerce?

Yes _√_

No ____

**B9.** Did the contract, combination, or conspiracy injure Dr. Nanavati in his business or property?

Yes _√_

No ____

**IF YOUR ANSWER TO QUESTION B9 IS YES, ANSWER QUESTION B10, OTHERWISE GO TO SECTION C**

**B10.** Did Dr. Nanavati first sustain injury before June 5, 1980?

Yes ____

No _√_

**B11.** What is the amount of damages which Dr. Nanavati sustained because of the contract, combination, or conspiracy?

$ _350,000.00_

 .

## SECTION C: Dr. Nanavati's Interference With Business Claim

**C1.** Did Dr. Sorensen interfere with Dr. Nanavati's existing or future business relations?

Yes _____

No _____✓_____

## IF YOUR ANSWER TO QUESTION C1 IS YES, ANSWER QUESTION C2. OTHERWISE GO ON TO SECTION D

**C2.** Was Dr. Sorensen's conduct privileged?

Yes _____

No _____

## IF YOUR ANSWER TO QUESTION C2 IS YES, ANSWER QUESTION C3. IF YOUR ANSWER IS NO, GO ON TO QUESTION C4

**C3.** Was Dr. Sorensen motivated by ill will or malicious intent to harm Dr. Nanavati?

Yes _____

No _____

**C4.** What is the amount of damages caused to Dr. Nanavati by such interference?

$ _____

**IF YOU ANSWERED QUESTION C4. ANSWER QUESTION C5.**
**OTHERWISE GO ON TO SECTION D**

**C5.** If you find that punitive damages should be awarded by reason of such interference, what is the amount of such punitive damages?

$ _____

**SECTION D: The Hospital's Slander Claims**

**D1.** Were any of Dr. Nanavati's statements, which the Hospital claims are defamatory, false?

Yes __✓__

No _____

**IF YOUR ANSWER TO QUESTION D1 IS YES. ANSWER**
**QUESTION D2. OTHERWISE GO ON TO SECTION E**

**D2.** Did those false statements defame the Hospital?

Yes __✓__

No _____

**IF YOUR ANSWER TO QUESTION D2 IS YES. ANSWER**
**QUESTION D3. OTHERWISE GO ON TO SECTION E**

**D3.** Was Dr. Nanavati at least negligent in making those false statements?

Yes __✓__

No _____

1242

**IF YOUR ANSWER TO QUESTION D3 IS YES, ANSWER QUESTION D4, OTHERWISE GO ON TO SECTION E**

**D4.** Was the Hospital harmed by those statements?

Yes ___✓___

No _____

**D5.** Were those statements privileged?

Yes ___✓___

No _____

**IF YOUR ANSWER TO QUESTION D5 IS YES, ANSWER QUESTION D6, IF YOUR ANSWER IS NO, GO ON TO QUESTION D7**

**D6.** Was Dr. Nanavati motivated by ill will or malicious intent to harm the Hospital?

Yes ___✓___

No _____

**D7.** What is the amount of damages you award for the harm caused to the Hospital by the defamation?

$ _100,000.00_

**IF YOU ANSWERED QUESTION D6, ANSWER QUESTION D7, OTHERWISE GO ON TO SECTION E**

**D7.** If you find that punitive damages should be awarded because of the defamation, what is the amount of those punitive damages?

$ *50,000.00*

## SECTION E: Dr. Sorensen's Slander Claims

**E1.** Were any of Dr. Nanavati's statements, which Dr. Sorensen claims defamed him, false?

Yes ✓

No _____

**IF YOUR ANSWER TO QUESTION E1 IS YES, ANSWER QUESTION E2, OTHERWISE GO ON TO SECTION F**

**E2.** Did those false statements defame Dr. Sorensen?

Yes ✓

No _____

**IF YOUR ANSWER TO QUESTION E2 IS YES, ANSWER QUESTION E3, OTHERWISE GO ON TO SECTION F**

**E3.** Was Dr. Nanavati at least negligent in making those false statements?

Yes ✓

No _____

**IF YOUR ANSWER TO QUESTION E3 IS YES, ANSWER QUESTION E4, OTHERWISE GO ON TO SECTION F**

1244

**E4.** Was Dr. Sorensen harmed by those statements?

Yes ___✓___

No _____

**E5.** Were those statements privileged?

Yes ___✓___

No _____

**IF YOUR ANSWER TO QUESTION E5 IS YES, ANSWER QUESTION E6. IF YOUR ANSWER IS NO, GO ON TO QUESTION E7**

**E6.** Was Dr. Nanavati motivated by ill will or malicious intent to harm the Dr. Sorensen?

Yes ___✓___

No _____

**E7.** What is the amount of damages you award for the harm caused to Dr. Sorensen by the defamation?

$ _100,000.00_

**IF YOU ANSWERED QUESTION E7, ANSWER QUESTION E8. OTHERWISE GO ON TO SECTION F**

**E8.** If you find that punitive damages should be awarded because of the defamation, what is the amount of those punitive damages?

$ _500,000.00_

## SECTION F: Dr. Sorensen's Interference With Business Claim

**F1.** Did Dr. Nanavati interfere with Dr. Sorensen's existing or future business relations?

Yes ___✓___

No _____

## IF YOUR ANSWER TO QUESTION F1 IS YES, ANSWER QUESTION F2, OTHERWISE GO ON TO SECTION G

**F2.** Was Dr. Nanavati's conduct privileged?

Yes ___✓___

No _____

## IF YOUR ANSWER TO QUESTION F2 IS YES, ANSWER QUESTION F3, OTHERWISE GO ON TO QUESTION F4

**F3.** Was Dr. Nanavati motivated by ill will or malicious intent to harm Dr. Sorensen?

Yes ___✓___

No _____

**F4.** What is the amount of damages caused to Dr. Sorensen by the interference?

$ 100,000.00

## IF YOU ANSWERED QUESTION F4, ANSWER QUESTION F5, OTHERWISE GO ON TO SECTION G

**F5.** If you find that punitive damages should be awarded by reason of the interference, what is the amount of the punitive damages?

$ *3 00. 000. 00*

## SECTION G: Total Recoveries

**G1.** If you have awarded damages to Dr. Nanavati in two or more of Questions A6, B11, and C4, what is the actual amount you award for those combined damages so as not to duplicate them?

$ _____

**G2.** If you have awarded damages to Dr. Sorensen in Questions E7 and F4, what is the actual amount you award for those combined damages so as not to duplicate them?

$ *200,000. 00*

**G3.** If you have awarded punitive damages to Dr. Sorensen in Questions E8 and F5, what is the actual amount you award for those combined punitive damages so as not to duplicate them?

$ *800. 000. 00*

## APPENDIX B

## NOT FOR PUBLICATION

Civil Action Nos. 83–0794, 84–1790

## OPINION

July 10, 1986

COHEN, Senior District Judge:

Presently before the Court are requests for rulings on four issues relating to the defamation claims against Suketu H. Nanavati. The first issue is whether we should grant Dr. Sorenson's motion *ad litem* to amend his pleadings pursuant to Fed.R. Civ.P. 15, to state a new defamation claim against Dr. Suketu H. Nanavati. The second issue is whether the statements which form the basis of the defamation claims are actionable. The third issue is whether Burdette Tomlin Memorial Hospital (BTMH), as an incorporated entity, and a defamation plaintiff herein, must prove special damages in order to have a viable defamation claim. The fourth is whether either Dr. Robert J. Sorenson or BTMH is a "public figure" for purposes of their respective defamation claims. These issues will be discussed in turn.

## THE NEW CLAIM FOR DEFAMATION

On June 30, 1986 Anne O'Neil testified, in response to questioning by Dr. Sorenson's co-counsel Robert E. Paarz, to a statement made to her by Dr. Nanavati. She testified that sometime in November, 1985 Dr. Nanavati referred to Dr. Sorenson as "a senile old doctor that had been there for twenty years killing patients." (Transcript of June 30, 1986, p. 160, lines 14 and 15). This testimony was elicited in the following manner:

Mr. Paarz: Other than making that statement to you or those statements you just told us about, was there anything else specifically that he mentioned that you can recall?

Ms. O'Neil: Just, you know, the main thing was about Dr. Sorenson, you know, saying that he had been there for 20 years killing patients, he was a senile old doctor.

Mr. Paarz: What was that?

Ms. O'Neil: Senile old doctor that has been there for 20 years killing patients. That kind of upset me.

The next day Dr. Sorenson, by written motion, requested this Court to allow amendment of the pleadings to assert a new defamation claim against Dr. Nanavati based on Dr. Nanavati's remark to Anne O'Neil. In support of his motion, Dr. Sorenson relies on this Court's Opinion filed June 24, 1986.[1] Dr. Nanavati opposes the motion, claiming that such an amendment is improper under Fed.R.Civ.P. 15(d). He urges that Dr. Sorenson has not sustained his burden of establishing significant prejudice if the motion were denied. Dr. Nanavati argues that, on balance, he, not Dr. Sorenson, would be severely prejudiced by an adverse ruling.

We note at the outset that Dr. Sorenson's motion, which seeks to add a claim based upon events which occurred after the date of the pleading to be supplemented, falls within the purview of Fed.R.Civ.P. 15(d). Unlike Rules 15(a) and (b), however, Rule 15(d) does not so freely permit the amendment pleadings. It provides in relevant part:

Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading setting forth transactions or occurrences or events

1. In that Opinion, we granted Dr. Nanavati's motion to amend the pleadings pursuant to Fed. R.Civ.P. 15, to include Burdette Tomlin Memorial Hospital and the Executive Committee of the Medical Staff as antitrust defendants because, *inter alia*, these parties had notice of the allegations, and thereby were not prejudiced by allowing the amendment.

which have happened since the date of the pleading to be supplemented.

Fed.R.Civ.P. 15(d). Nevertheless, it is within our discretion to either permit or deny such an amendment. *See Owens-Illinois Inc. v. Lake Shore Land Co., Inc.,* 610 F.2d 1185, 1188–89 (3d Cir.1979); *Bates v. Western Electric,* 420 F.Supp. 521, 525 (E.D.Pa.1976).

In exercising our discretion, we are mindful of the possible prejudice which may accrue to each of the parties as a result of an adverse ruling. We find, however, that Dr. Nanavati's contentions of severe prejudice are without merit. He, through his counsel, cross-examined Ms. O'Neil at trial, at which time he had the opportunity to inquire into her possible bias or prejudice. Further, Dr. Nanavati had the opportunity during the past week (after Ms. O'Neil's testimony) to investigate Ms. O'Neil's background, evaluate her contention, and present appropriate rebuttal witnesses.

Ms. O'Neil, who was listed as a witness in the Joint Final Pretrial Order, was not a surprise witness, and the statement to which she testified arose out of the same basic set of circumstances which gave rise to this lawsuit. This "conflict" has lasted more than seven years. The time has come to put it to an end. We shall not require Dr. Sorenson to file a separate action in the state court in order to pursue this claim, but we shall grant Dr. Sorenson's motion to supplement his pleadings.

THE ACTIONABLE NATURE OF THE STATEMENTS

The defamation defendant, Dr. Nanavati, contends that none of the statements upon which the plaintiffs' defamation action is based are actionable because each statement is absolutely protected as an expression of opinion. He further argues that even if the statements are not absolutely protected, each is, by virtue of the context in which it was made, privileged by Dr. Nanavati's interest in and duty to protect his patients.

Three statements have been identified by the Hospital as bases for its defamation claim. These statements are: 1) an April 25, 1982 statement to Mrs. Lorenzo, a patient, that the Hospital was "too dirty," 2) a set of statements made to a newspaper reporter for the Atlantic City *Press* that "I was concerned about everyone's life after that ... I saw that man (the patient's husband) and I had to cover up for this doctor (Sorenson).... The correct interpretation (of the EKG's) would have saved her life ...," and 3) a June 14, 1982 statement within a letter to the Joint Commission on Accreditation of Hospitals (JCAH) requesting that the commission investigate "what I regard to be substandard practices occurring in the Cardiac Care Unit at [BTMH]." A fourth statement has been identified by Doctor Sorenson as a basis for his defamation action. This statement was the one allegedly made to a nurse, Ms. O'Neil, on November 1985, which we have just discussed.

Because there is no such thing as a false opinion, *see Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974), pure opinions, no matter how pernicious, are absolutely protected by the First Amendment. *Avins v. White,* 627 F.2d 637, 642 (3d Cir.) *cert. denied* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980) (applying Delaware law); *Kotlikoff v. The Community News* 89 N.J. 62, 68–69, 444 A.2d 1086 (1982). *See also* Restatement (Second) of Torts § 566 (1977). The First Amendment does not, however, protect statements which, even if they appear to be opinion, are in reality assertions of fact. *See* Restatement (Second) of Torts at § 566; *Kotlikoff, supra,* at 69, 444 A.2d 1086. Thus, distinguishing between pure opinion and factual assertions is of obvious importance. The issue is one of law for the court, *Kotlikoff* at 67, 444 A.2d 1086, and has been squarely presented in this case.

Clear guidelines for discerning opinion from fact have not yet been established. *See Ollman v. Evans,* 750 F.2d 970, 977 (D.C.Cir.1984) (describing the area as "largely uncharted seas"). The emergent view seems to be that the courts should analyze the totality of the circumstances in

which the statements were made to decide whether they merit absolute protection, but a review of the case law reveals that certain factors have been isolated which provide assistance in distinguishing opinion from factual assertion. These factors include: the ambiguousness of the specific language used, the verifiability of the statements, the full context of the publication which contains the challenged statements, and the setting in which the statements appear. *Ollman, supra* at 979.

Our consideration of the totality of the circumstances in which the statements were made, in this case, leads us to conclude that the statement made to the JCAH, but only that statement, is a protected expression of pure opinion. In reaching our decision, we have attempted to assess the average reader's view of the statement, *see Ollman, supra,* at 979 n. 16, in an effort to discern whether the statements merely express a derogatory opinion, or if, in contrast, they are false imputations of fact. *See generally* W. Page Keeton, *Prosser and Keeton on Torts,* § 113A, pp. 813–15 (5th ed. 1984). We consider it important, in this regard, to assess whether a given statement provides the reader with, or reasonably assumes that the reader already knows, the factual bases for the statement, so that the reader has enough information to recognize the statement as opinion, *see* Restatement (Second) of Torts § 566 comment b (1977), and, potentially, to permit the reader to form his own opinion.

Before explaining our analysis with respect to each statement, we must note that we have felt constrained, in our determinations, not to give weight to considerations of the true motivations of the speaker. The First Amendment protects, absolutely, statements which are opinion. We shall not therefore attempt to evaluate either the reasonableness of such opinions, or the reasons for their expression. To do so would violate the speaker's First Amendment right of free expression.

The statement to Mrs. Lorenzo, which is capable of defamatory meaning, clearly implies the existence of undisclosed facts.

The language has a commonly understood meaning, and neither the context of the publication nor the setting in which it was made would put the average reader or listener on notice that the statement is not protected opinion. Obviously, the statement to Ms. O'Neil was also not a protected opinion.

Similarly, the statements made to the newspaper reporter are not protected expressions of "pure" opinion. The statements do not disclose their factual bases and they are unambiguous in their meaning. In addition, nothing in the article, taken as a whole, can fairly be said to put the average reader on notice that the statements are mere opinion.

In contradistinction to the statements just discussed, the statements contained within the letter to the JCAH are pure opinion. Not only are these statements couched in "opinion" language, but they are explicitly based on facts which are disclosed. Obviously, the factual bases are disclosed in somewhat general form, but the letter itself encourages the reader to acquire specifics. As such, the full publication clearly suggests that the statements are opinion. Furthermore, the very nature of the subject matter—an interpretation of JCAH guidelines and their specific application to a given hospital situation—provides notice to the reader that the content is rife with subjectivity. Such statements are, obviously, difficult to verify, and would not be accepted as factual by the average reader. In short, it cannot be said that the average reader would view the statement as fact. Thus, as a matter of law, the statement contained in the letter to the JCAH is an expression of opinion and is not actionable.

Turning to the defamation defendant's claim that his statements were subject to a qualified privilege, we hold that the statements must still be submitted to the jury. A qualified privilege is lost if the statement to which the privilege attaches is motivated chiefly by ill will, *Coleman v. Newark Morning Ledger Co.,* 29 N.J. 357, 383, 149 A.2d 193 (1959), and a question exists in

this case regarding Dr. Nanavati's actual motivation in making the statements at issue. Accordingly, the jury will be allowed to consider these statements as potentially defamatory.

THE NEED TO PROVE SPECIAL DAMAGES

Dr. Nanavati argues that a corporation, not being a private person, can only recover for a defamation which caused it special damages. BTMH contends that a corporation need not prove special damages to recover under New Jersey law for alleged defamatory statements affecting it in its business. The general rule is that where a plaintiff's action is based on a defamation which adversely affects him in his business, such statement is a defamation *per se*, and plaintiff need not prove special damages. *See Mullenmeister v. Snap-On Tools Corp.*, 587 F.Supp. 868, 871 (S.D.N.Y. 1984) (New York law); *Zerpol Corp. v. DMP Corp.*, 561 F.Supp. 404, 409–10 (E.D. Pa.1983) (Pennsylvania law); Restatement (Second) of Torts § 573 (1982); W. Page Keeton, *Prosser and Keeton on Torts*, § 112, pp. 788, 790–92 (slander) and 795–96 (libel) (5th ed. 1984).

At the outset, we find that the statements upon which BTMH's claims are based are defamation *per se* because these statements, to the extent they are actionable, *see* discussion, *supra*, do adversely reflect upon BTMH in its business. Dr. Nanavati contends, however, that a corporation, unlike a natural person, must prove special damages even when the alleged defamation is defamation *per se*. We find his argument unconvincing. *See Zerpol*, 561 F.Supp. 404, 409–10 (E.D.Pa.1983) (under Pennsylvania law a corporation was not required to plead special damages where the defamation was actionable *per se* ). In support of his contention Dr. Nanavati cites *Canino v. New York News, Inc.*, 475 A.2d 528 (N.J.1984). The relevant passage is as follows:

That libel *was* regarded as an injury to the person is shown in *Trenton Mut. Life & Fire Ins. Co. v. Perrine*, 23 N.J.L. 402 (Sup.Ct.1852), in which a corporation, not being a natural person, could recover only for a libel that caused it special damages. (emphasis supplied).

This passage, aside from being *dicta*, merely cites *Trenton Mutual* in a recitation of the history of defamation law in New Jersey, not necessarily as the present state of the law. Although neither the parties nor the Court have been able to locate any recent New Jersey case on point, we conclude that, despite the language used by the New Jersey Supreme Court in 1852 in *Trenton Mutual*, the New Jersey Supreme Court today would apply the hornbook rule, and not require a corporation to plead special damages where the alleged defamation constitutes defamation *per se*. Accordingly, BTMH need not prove special damages in support of its defamation claim against Dr. Nanavati.

THE LEGAL STATUS OF THE DEFAMATION PLAINTIFFS

Finally, we turn to the question whether either Dr. Sorenson or BTMH is a "public figure" for purposes of their defamation claims. A plaintiff in a defamation action, if found to be a "public figure," must prove an additional element in order to succeed on his claim—he must prove that the defendant made the alleged defamatory statements with actual malice. *See New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welsh, Inc.*, 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). Dr. Nanavati argues that both Dr. Sorenson and BTMH are "public figures" within the meaning of the defamation laws. Dr. Sorenson and BTMH contend that they are not.

The United States Supreme Court, in *Gertz, supra*, identified two types of public figures. The first are those individuals who occupy positions of such pervasive power and influence or who achieve such pervasive fame or notoriety that they are deemed public figures for all purposes. 418 U.S. at 345, 351, 94 S.Ct. at 3009, 3012. The second are those "individual[s] [who] inject[ ] [themselves] or [are] drawn into particular public controvers[ies] and there-

by become[ ] [ ] public figure[s] for a limited range of issues." *Id.* at 351, 94 S.Ct. at 3012. Apparently, it is this second test for public figures which Dr. Nanavati urges applies to the defamation plaintiffs herein. The Third Circuit, in *Marcone v. Penthouse International Magazine for Men Ltd.*, 754 F.2d 1072 (3d Cir.) *cert. denied,* —— U.S. ——, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985), applied a two part test to determine whether the defamation plaintiff was a limited purpose public figure. First, the *Marone* Court analyzed whether the alleged defamation concerned a "public controversey," as contrasted with a dispute of interest to the public. *Id.* at 1082. *See also Time, Inc. v. Firestone,* 424 U.S. 448, 458, 96 S.Ct. 958, 967, 47 L.Ed.2d 154 (1976). Second, it considered the nature and extent of plaintiff's participation in the controversy. *See Marcone,* 754 F.2d at 1082.

We entertain no doubt that the present case involves a public controversy. The challenged statements involve the reputation of a hospital and a doctor and their capacity to provide quality medical care to the people of Cape May County. We reject BTMH's assertion that this is a private matter, akin to divorce proceedings. All residents of the Southern New Jersey Area have a stake in the present controversy because all are potential patients at BTMH.

With respect to the second element of the *Marcone* test, however, we conclude that the nature and extent of the defamation plaintiffs' participation in the public controversy are insufficient to render either plaintiff a public figure. Dr. Sorenson has done little if anything to thrust himself into the public limelight on the issues in question, save from filing this defamation action. BTMH also has not injected itself into the controversy to an extent requiring us to label it a public figure. BTMH's involvement in the inhouse proceeding and the state court action against Dr. Nanavati are insufficient to

render it a public figure in connection with its dispute with Dr. Nanavati.

BTMH does not attain the status of a "public figure" merely because it attempted to terminate, for whatever reason, the hospital privileges of a doctor. Nor should it be deemed a public figure because it defended its interests in the courts. *See Levine v. CMP Publications, Inc.,* 738 F.2d 660, 671–672 (5th Cir.1984). It is important to note that the defamation plaintiffs herein did not voluntarily bring this dispute into the public forum. It was Dr. Nanavati who gave notoriety to the goings-on at the Hospital. It was he who filed, on two occasions, charges before the Equal Employment Opportunity Commission, and who brought the state court actions before Judge Rimm and Judge Gibson. Further, it was Dr. Nanavati, not BTMH or Dr. Sorenson, who gave numerous interviews to the press regarding the controversies at issue. We do not question Dr. Nanavati's legal right to take these steps, but merely suggest that it was these activities of Dr. Nanavati which gave rise to the defamation plaintiffs' participation, albeit limited, in a public controversy.[2] The extent of the defamation plaintiffs' participation in the controversy at issue mitigates against labeling them public figures. We hold that neither BTMH nor Dr. Sorenson shall not be considered a public figure for purposes of the defamation actions against Dr. Nanavati.

It is so Ordered.

## APPENDIX C

### NOT FOR PUBLICATION

Civil Action Nos. 83–0794, 84–1790.

### OPINION

July 8, 1986.

COHEN, Senior District Judge: ·

The issue presently before the Court, which we shall call, in the interest of brevi-

---

**2.** It is, however, arguable that BTMH, in essence, advertised its services, either explicitly or implicitly, and therefore should be deemed a public figure only with respect to comment on its advertising. *See Steaks Unlimited, Inc. v.*

*Deaver,* 623 F.2d 264, 272–73 (3d Cir.1980). However, in the absence of any proofs regarding BTMH's advertising, if any, we are unprepared to hold that they injected themselves into the public spotlight on the issue of patient care.

ty, the "antitrust *per se* issue," presents yet another close question which has been hard fought by the parties. Reduced to its base, the issue is whether plaintiff Dr. Nanavati is entitled to a jury charge which informs the jury that if a group boycott of Dr. Nanavati is found, then a *per se* antitrust violation has occurred.

Two tests have been developed for evaluating the activities of entities charged with antitrust violations. These tests are the "rule of reason" and the *"per se* rule." *See generally National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

In the ordinary case in which a violation of the antitrust laws is alleged, the finder of fact is called upon to analyze the activities complained of to determine whether they *unreasonably* restrain trade. This analysis, an application of the "rule of reason," seeks to evaluate the competitive significance of the alleged restraint, to discern whether the activities have anticompetitive effects which outweigh their potential pro-competitive effects.

There are certain agreements to restrain trade, however, which, by virtue of their nature and necessary effect, are so plainly anticompetitive that no such evaluative weighing is required in order to establish their illegality. These agreements are, if proven, illegal *per se.* Concerted refusals to deal, or "group boycotts," are one type of such agreements. Accordingly, under ordinary circumstances, if the fact finder were to find that a group boycott occurred, the antitrust plaintiff would prevail.

A complication arises, however, when the antitrust defendants are members of a learned profession. Because the United States Supreme Court has cautioned that it would be unrealistic to automatically apply to the professions antitrust concepts which originated with respect to activities occurring in business, *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 788, n. 17, 95 S.Ct. 2004, 2013, n. 17, 44 L.Ed.2d 572 (1975), a series of cases have arisen which attempt to define a "learned profession exception" to the *per se* rule. The Third Circuit, in

*Weiss v. York Hospital,* 745 F.2d 786 (3d Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985), has recently addressed this exception and its application in some detail. In *Weiss,* an osteopathic physician who had been denied staff privileges at the defendant hospital brought an action, individually and as a representative of the class of all osteopathic physicians in the area, alleging, *inter alia,* violations of the Sherman Act, 15 U.S.C. §§ 1 & 2. The Third Circuit, affirming in part and reversing in part the district court's entry of judgment on the jury's verdict in favor of the class, clearly expressed its view that the learned profession exception to the *per se* rule calls for the application of the rule of reason when, but apparently only when, the defendants offer a "public service or ethical norm" rationale for their challenged activities. *Weiss* at 821. Specifically, the *Weiss* Court suggested that an assertion that the antitrust plaintiff had displayed unprofessional conduct, including disruptiveness, would bring the rule of reason analysis to bear. *Id.* at n. 60. The *Weiss* Court, however, did not reach the issue whether the mere *assertion* of such a rationale would itself suffice to invoke the rule of reason analysis.

Because the defendants in this case have urged, as a defense, that the antitrust plaintiff's behavior was disruptive, we are forced to confront this issue. Upon reflection, we believe that allowing the mere assertion of such a defense to dispose of the *per se* rule would vitiate much of the substance of that rule. To assure that the advanced public service rationale is not merely pretext, we believe it is necessary to submit the issue to the jury. Specifically, we consider it appropriate in this case to instruct the jury that if they find that a group boycott occurred, they are to consider this a *per se* violation of the antitrust laws, *unless* they also find that the boycott was in fact motivated by a "public service" rationale. In the event that the jury finds a public service motivation for the group boycott, they will be instructed that they are to apply the rule of reason to evaluate the overall competitive significance of the activity.

## ORDER

This matter having come before the Court on post-trial motions by plaintiff/counterclaim—defendant, Suketu H. Nanavati, M.D. for a judgment notwithstanding the verdict ("j.n.o.v.") pursuant to Fed.R.Civ.P. 50(b), and, in the alternative, for a new trial pursuant to Fed.R.Civ.P. 59(a) and defendant/counterclaim—plaintiff, Burdette Tomlin Memorial Hospital, and defendant, the Executive Committee for a j.n.o.v. and, alternatively, for a new trial; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

It is on this 2nd day of October, 1986 ORDERED that the motion for j.n.o.v. and new trial made by Dr. Nanavati shall be DENIED, and the motion for j.n.o.v. by the Hospital and the Executive Committee shall be GRANTED.

It is further ORDERED that judgment previously entered in favor of Dr. Nanavati and against defendants, Burdette Tomlin Memorial Hospital and Executive Committee of the Medical Staff of Burdette Tomlin Memorial Hospital shall be vacated, and a Judgment of No Cause for Action shall be entered.